JOHN SCHIAPPA and SUSIE
GODINHO,

      Plaintiffs,

v.

CHARITYUSA.COM, LLC,

      Defendant.

_____/

## ORDER AND OPINION GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court on Defendant CharityUSA.com, LLC's ("CUSA")

Motion for Summary Judgment ("Motion"), filed on April 3, 2017. (DE 29). Plaintiffs John

Schiappa ("Schiappa") and Susie Godinho ("Godinho," together with Schiappa, "Plaintiffs")

filed a Response in opposition on April 24, 2017 (DE 36), to which CUSA replied on May 1,

2017 (DE 40). For the reasons stated below, the Motion is granted in part.

**I.    Background**

Plaintiffs own three registered trademarks that are at issue in this case. (DE 1, hereinafter

"Complaint" or "Compl." at ¶ 9). All three of the marks incorporate the same basic design: a

stylized paw image featuring four digital pad prints above a metacarpal pad print in the shape of

the heart symbol. (*Id.*) (hereinafter, "heart paw"). Plaintiffs registered three variants of the heart

paw: one where the heart symbol faces upright (the "upright heart paw", Reg. No. 3,473,401),

one where it is inverted (the "inverted heart paw", Reg. No. 4,168,268), and one where three

upright heart paw crowns three characters in the phrase "3 Dawg" (the "3 Dawg mark", Reg. No. 3,5). (*See* Figure 1, below; Compl. at ¶ 9).

| Mark | Reg. No. | Issued | Goods |
|---|---|---|---|
|  | 4,168,268 | July 3, 2012 | Athletic apparel, namely, shirts, pants, jackets, footwear, hats and caps, athletic uniforms; Children's and infant's apparel, namely, jumpers, overall sleepwear, pajamas, rompers and one-piece garments; Scientific and technological apparel, namely, shirts, pants, jackets, footwear, hats and caps, uniforms; Shirt fronts; Shirts; Sleep shirts; Sport shirts; Sports shirts; Sports shirts with short sleeves; Sweat shirts |
|  | 3,521,549 | Oct. 21, 2008 | Clothing, namely, shirts, T-shirts, pants, skirts, shorts, sweaters, jackets, caps, hats, vests, overalls and belts |
|  | 3,473,401 | Jul. 22, 2008 | Belts; Caps; Dresses; Hats; Headbands; Scarves; Shirts; Shorts; Socks; Sweat pants; T-shirts; Tank tops |

Godinho represents that she first used the upright heart mark in commerce as early as June 1, 2007 (DE 37-4, "Godinho Declaration" ¶ 3) and first used the inverted heart mark in commerce as early as January 10, 2010 (*id.* at ¶ 4; *see also* DSOF ¶ 20).[1] However, Plaintiffs do not have records of any sales before January 2014. (DSOF ¶¶ 19, 21).

---

[1] Pursuant to Local Rule 56.1(a), CUSA filed a Statement of Material Facts the same day as the instant Motion. (DE 30). Plaintiffs filed a Counter Statement of Facts in opposition (DE 37), to which CUSA filed a factual reply (DE 41). Except where Plaintiffs introduce additional facts or dispute those raised by CUSA, the Court will refer solely to CUSA's Statement, which is styled "DSOF." Plaintiffs' Statement in opposition, where referenced, is labeled "PSOF." CUSA's factual reply, where referenced, is labeled "DFR."

Plaintiffs use the heart paw marks in connection with their company, 3 Dawg, which sells certain apparel and accessories. (Compl. at ¶ 8; DSOF ¶ 15). The Parties dispute the extent of Plaintiffs' product line. But as even Godinho acknowledges, Plaintiffs' inventory consists only of tank tops, t-shirts, cap sleeved shirts, jersey shorts, and hats. (PSOF ¶ 15). Other apparel must be specially ordered. (*Id*.). Plaintiffs affix the heart paw marks to the products they sell (DSOF ¶ 15) and also use them on their website, product packaging, advertising materials, hang ties, and on social media (PSOF ¶ 15). In terms of design, Plaintiffs sell clothing that features different patterns and combinations of the marks (DSOF ¶ 18) "based on the customer's request" (*id*.).

Most of Plaintiffs' sales derive from animal rescue or other "dog events" in South Florida. (DSOF ¶ 26). Since 2008, Godinho has attended one to two of these events per month, where – she estimates – she makes between $200 and $300. (PSOF ¶ 25). At these events, Godinho sets up a display table of clothes featuring the marks and solicits event-goers. (DSOF ¶ 27). She also wears her products to garner attention from passers-by. (*Id*. at ¶ 29). Sometimes, part of the proceeds from animal rescue events go to the rescue organizations. (DE 36 at 5; DE 37-2, Godinho Depo., 158:7-17). Besides dog events, Plaintiffs make sales through their website and have fulfilled at least one bulk order. (PSOF ¶ 25). Additionally, there is some evidence of isolated sales to customers in states outside of Florida and in Canada. (*Id*. at ¶ 23). Godinho testified that Plaintiffs' cash sales for 2014 and 2015 were between $2,000 and $10,000 per year. (DSOF, Ex. A, "Godinho Depo." at 101:4-19). Sales records reflect that, between January 2014 and December 2016, Plaintiffs earned about $2,500 from apparel. (DSOF ¶ 25). With respect to advertising efforts, Plaintiffs have placed ads in the publication "Modern Dog" and on Twitter and also promote their products on various social media platforms. (PSOF ¶¶ 30-32). Godinho

has, however, expressed doubt as to the effectiveness of at least some of these expenditures. (DSOF ¶ 32).

CUSA is a limited liability company that operates "a network of online activism websites" geared towards the protection of "animals, people, and the planet." (DSOF ¶ 1). One of CUSA's websites, www.theanimalrescuesite.com ("RescueSite"), sells "animal-related products." (DSOF ¶ 2). Part of the proceeds from those sales is donated to animal shelters and sanctuaries. (*Id.*). Many of CUSA's products feature graphic designs that resemble the upright and inverted heartpaw marks or in some way incorporate the heart symbol into paw print designs. (DSOF ¶ 8). These include clothing but also "jewelry, Christmas ornaments, cell phone cases, wallets, bags, luggage, mugs, other kitchen items, magnets, rain boots, sheets, blankets, and [] others." (*Id.*). The Parties dispute when CUSA began selling these kinds of items and whether those sales predate Plaintiffs' use of the marks. (DSOF ¶¶ 3-5; PSOF ¶¶ 3-5; DFR ¶ 3 & Ex. V).[2]

There is no statistical evidence, such as surveys, studies, or focus groups, establishing any actual confusion between Plaintiffs' marks and CUSA's product designs. (DSOF ¶ 39). Godinho testified to an anecdotal instance in which a friend indicated that she had seen products on the RescueSite which she thought had come from Plaintiffs. (DSOF ¶ 38; PSOF ¶¶ 36-38; Godinho Depo. 209:4-213:12). She also referred to two anonymous individuals who also may have made similar observations. (DSOF ¶ 38).

---

[2] CUSA claims that its in-house design team created heart paw designs as early as 2004 and began selling products with these designs in 2004 or 2005. (DOSF ¶ 3). To rebut this assertion, Godinho, in her declaration, states that she registered an account on the RescueSite on June 22, 2007 and at that time, "witnessed no" allegedly infringing marks. (Godinho Decl. at ¶ 20). CUSA, in reply, attaches a printout from its internal database, which contains entries showing that some products with paw-related designs were first sold in 2004. (DFR, Ex. V). But it is unclear how many – if any – of these designs can be considered sufficiently related to the marks so as to have preempted Plaintiffs' first use in commerce.

Several third party entities that sell pet items employ heart paw designs on products for sale (DSOF ¶ 43) and at least three incorporate some form of it in a registered mark (*id.* at ¶ 46). In 2008 and between 2014 and 2016, Godinho sent some of these third parties demand letters, insisting they cease their allegedly infringing use of Plaintiffs' marks. (DSOF ¶¶ 44-45; PSOF ¶¶ 44-45). Some of the third parties complied but others did not. (DSOF ¶ 45). Godinho contacted CUSA by email on March 23, 2015. (DSOF ¶ 48). In her message, Godinho advised CUSA about her registered marks and asked about the opportunity to sell her products on RescueSite. (*Id.*). Conversations continued between Godinho and CUSA's CEO, James T. Kunin ("Kunin"), and the two sides came close to reaching an agreement pursuant to which CUSA would buy Plaintiffs' inverted heart mark. (*Id.*). However, the deal broke down and the Parties now dispute whether a contract was ever formed. (DSOF ¶ 48; PSOF ¶ 48).

Plaintiffs filed a Complaint against CUSA on September 21, 2016. (DE 1). The Complaint asserts four causes of action against CUSA: (1) trademark infringement under 15 U.S.C. § 1114 (Compl. at ¶¶ 24-28); (2) false designation, description, and representation under 15 U.S.C. § 1125(a) (§ 43(a) of the Lanham Act) (*id.* at ¶¶ 29-33); (3) common law trademark infringement (*id.* at ¶¶ 34-38); and (4) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. St. §§ 501.201, *et seq.* (*id.* at ¶¶ 39-43). On October 28, 2016, CUSA filed an Answer with affirmative defenses and counterclaims. (DE 15). The counterclaims allege that the marks are void for non-use and non-distinctiveness and because, at least in the case of the inverted heart paw, CUSA used that design in commerce first. (*Id.* at ¶¶ 21-50). Additionally, CUSA claims that Plaintiffs breached the contract to purchase the inverted heart mark and should be prevented, as a matter of promissory estoppel, from withdrawing from the agreement. (*Id.* at ¶¶ 51-74). In terms of relief, CUSA requests that the Court cancel

Plaintiffs' trademarks and order specific performance of the putative contract. (*Id.*). The Parties engaged in discovery and the instant Motion followed.

## II.     Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)(1)(A)). Where the non-moving party bears the burden of proof on an issue at trial, the movant may simply "[point] out to the district court [] that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the movant has met its burden under Rule 56(c), the burden shifts to the non-moving party to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).

Although all reasonable inferences are to be drawn in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party may not rest upon the mere allegations or denials of the adverse party's pleadings, but instead must come forward with "specific facts showing that there is a *genuine issue for trial*." *Id.* at 587 (citing Fed. R. Civ. P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* "A mere 'scintilla' of evidence supporting the opposing party's

position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the non-moving party fails to make a sufficient showing on an essential element of her case on which she has the burden of proof, the moving party is entitled to a judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

## III. Discussion

### A. Plaintiffs' Claims

Plaintiffs have alleged two statutory claims under the Lanham Act, as well as one common law trademark claim and one state statutory claim under FDUTPA. It is not necessary to separately examine the latter two because "the analysis is the same" for these as for the federal causes of action. *Babbit Elec., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir. 1994); *see also Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1521 (11th Cir. 1991). Findings with respect to the Lanham Act claims are therefore "equally conclusive" of the common law and FDUTPA claims. *Babbit Elec.*, 38 F.3d at 1181; *Suntree Tech., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) ("Plaintiff's failure to establish a likelihood of confusion as to its Lanham Act claim also extinguishes its claim under Florida law.") (citation omitted).

The two remaining claims, each alleging Lanham Act violations, share a similar analytical framework and governing principles. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). The main difference between them is that § 32(1) "applies [solely] to registered marks," *id.*, while § 43(a) applies to both registered and unregistered marks. *Brookfield Comm'n, Inc. v. W. Coast Ent'mt Corp.*, 174 F.3d 1036, 1046, n.8 (9th Cir. 1999). Not being limited by the registration factor, § 43(a) "prohibits a broader range of practices than does § 32."

*Two Pesos*, 505 U.S. at 768. But this has not stopped the Eleventh Circuit from approving a district court's unitary analysis when any such difference in scope would not affect the outcome of the case. *AmBrit v. Kraft, Inc.*, 812 F.2d 1531, 1545, n.73 (despite § 43(a)'s "analysis" being "somewhat broader than that in a § 32(1) claim," Eleventh Circuit affirmed district court's determination on both claims despite exclusive discussion of the former). Where, as here, only registered marks are at issue, a vague difference in scope between the statutory provisions should not prevent a uniform analysis of Plaintiffs' claims. That is especially the case where the court proceeds no further than examining the likelihood of confusion between sets of marks, as the seven factors of that inquiry, discussed *infra*, are the same under each section. *Tana v. Dantanna's*, 611 F.3d 767, 773, n.5 (11th Cir. 2010). Therefore, I treat Plaintiffs two Lanham Act claims together.

A trademark is "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. Ordinarily, "[t]o prevail on a trademark infringement claim under the Lanham Act, a party must prove that (1) it owns a valid and protectable mark, and (2) the opposing party's use of an identical or similar mark is likely to cause confusion." *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1080 (11th Cir. 2016).

I consider the validity prong only briefly. Where, as here, the enforcing party has already registered its marks with the United States Patent and Trademarks Office ("PTO"), such registration creates "a rebuttable presumption that the marks are protectable." *Welding Serv., Inc. v. Forman*, 509 F.3d 1351, 1357, n.3 (11th Cir. 2007) (citing 15 U.S.C. § 1057(b)) (internal quotation marks omitted); *see also Coach House Rest., Inc. v. Coach & Six Rest., Inc.*, 934 F.2d

8

1551, 1562 (11th Cir. 1991) (". . . Section 7(b) of the Lanham Act creates a presumption that the registrant has the exclusive right to use its mark throughout the United States") (citation omitted). However, so long as the trademarks are not incontestable, the alleged infringer may rebut this presumption by showing, by a preponderance of the evidence, that the trademarks are invalid. *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996). In this case, it is not necessary to determine whether or not CUSA has met this burden because even if it has, there is no likelihood of confusion.

"[T]he touchstone of liability in a trademark infringement action is not simply whether there is unauthorized use of a protected mark, but whether such use is likely to cause consumer confusion." *Custom Mfg. & Eng'r, Inc. v. Midway Serv., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007). Consumer confusion is key because the very purpose of trademark protection is "to reduce the cost of information to consumers by making it easy for them to identify the products or producers with which they have had either good experiences, so that they want to keep buying the product (or buying from the producer), or bad experiences, so that they want to avoid the product or the producer in the future." *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 339 (7th Cir. 1985). If a competitor's use of a similar or identical mark does not hinder the public's ability to discriminate between that entity's goods and the original producer's, there is no problem as far as trademark law is concerned. *See id.*

Two general points about likelihood of confusion are worth highlighting at the outset. First, the burden of proving such a prospect rests with "the party charging infringement." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004). Second, "[a]lthough likelihood of confusion generally is a question of fact, it may be decided as a matter of law." *Alliance Metals, Inc. v. Hinely Indus., Inc.*, 222 F.3d 895, 907 (11th Cir. 2000).

As to specifics, courts look at seven factors to determine whether consumer confusion is sufficiently likely. These are the:

> (1) strength of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods and services offered under the two marks; (4) similarity of the actual sales methods used by the holders of the marks, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Tana*, 611 F.3d at 774-75. The Eleventh Circuit stresses that "application of the [seven] factors entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'" *Custom Mfg.*, 508 F.3d at 649.[3] The most important factors are the strength of the mark and the presence of actual confusion. *Frehling Enter., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1135 (11th Cir. 1999).

1. Strength of the Mark

Traditionally, courts classify marks as belonging to one of four categories along a spectrum of strength according to their "distinctiveness." *Welding Serv.*, 509 F.3d at 1357. From strongest to weakest, the categories of marks are: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *Id.* As the Eleventh Circuit has explained:

> An arbitrary or fanciful mark bears no logical relationship to the product or service it is used to represent. A suggestive mark refers to some characteristic of the goods, but requires a leap of the imagination to get from the mark to the product. A descriptive mark identifies a characteristic or quality of the service or product.
>
> There are several different approaches to defining "generic." By one test, a generic name refers to a particular genus or class of which an individual article or service is but a member. By another measure, a generic name is the term by which the product or service itself is *commonly* known. Still other courts say a

---

[3] And, as it relates to the summary judgment standard, a finding that any one factor favors a likelihood of confusion does not necessarily preclude judgment as a matter of law for the defendant if the overall balance clearly tilts in the opposite direction. *Tana*, 611 F.3d at 775, n.7.

generic name depicts the product or service as a whole, rather than any particular feature, quality, or characteristic of the whole. Genericness lies not in the term itself, but in the use of the term: A word may be generic of some things and not of others: "ivory" is generic of elephant tusks but arbitrary as applied to soap.

*Id.* (citations and internal quotation marks omitted). A generic mark is "incapable" of being distinctive; a descriptive mark may be distinctive, but "only if it acquires a secondary meaning"; and a suggestive or arbitrary mark achieves distinctiveness without any proof of secondary meaning. *Am. Television & Comm'n Corp. v. Am. Comm'n & Television, Inc.*, 810 F.2d 1546, 1548-49 (11th Cir. 1987). A mark acquires secondary meaning when the "the primary significance of the [mark] in the minds of the consumer public is not the product but the producer." *Id.* at 1549. To decide whether a mark has reached this benchmark, courts examine "(1) the length and manner of its use; (2) the nature and extent of advertising, promotion and sales; (3) the plaintiff's efforts to promote a conscious connection in the public's mind between the name and the plaintiff's product or business; and (4) the extent to which the public actually identifies the name with the plaintiff's product or venture." *Id.* The spectrum-based approach is often referred to as the "*Abercrombie* test" because it derives from Judge Friendly's opinion in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976).[4] In addition to the

---

[4] CUSA urges that the *Abercrombie* spectrum is not the appropriate framework for evaluating the distinctiveness of visual marks. It relies instead on the Fifth Circuit's opinion in *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225 (5th Cir. 2010), where that court discarded the *Abercrombie* classifications and adapted a separate test for design marks that the Court of Customs and Patent Appeals had originally developed. *See Amazing Spaces*, 608 F.3d at 243-45 (evaluating whether registered service mark, a stylized five-pointed star circumscribed within circle, merited protection) (citing *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977)). While it is true that the Eleventh Circuit endorses the *Seabrook* test in the context of trade dress claims and has recognized the difficulty in applying *Abercrombie*'s spectrum terms to pictorial images, *see Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1323 & n.13 (11th Cir. 2012), there is no evidence that it has extended *Seabrook* to registered trademarks. And indeed, the Eleventh Circuit has relied on the *Abercrombie* spectrum to evaluate the strength of a registered design mark. *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1541 (11th Cir. 1985) (finding university's English bulldog logo

*Abercrombie* distinctiveness spectrum, the Eleventh Circuit advises courts to consider the extent of third-party use of the mark. *Frehling*, 192 F.3d at 1136. The fewer the additional users, the "more distinctive [is the mark], and therefore more easily recognized by consumers." *Id.* The more users, the more difficult the mark is to recognize. *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1257-58 (11th Cir. 2016). A mark is also "relatively strong" if it is incontestable. *Id.*[5]

On the distinctiveness inquiry, Plaintiffs assert that their marks are suggestive because the fusion of the animal motif with a heart symbol leads consumers to infer that "Plaintiffs' goods contribute to compassion, kindness, and affection for animals." (DE 36 at 5).[6] CUSA argues that the marks are merely descriptive because they do no more than "literally state 'I ♥ Dogs' or 'I love dogs.'" (DE 40 at 6). I find that the heart paw marks are suggestive. Being a stylized graphic – not words – the marks cannot *literally* state anything. They certainly do not describe any tactile characteristic of the apparel being sold (i.e., whether they are well-knit, warm, etc.). If they communicate the message that Plaintiffs' products benefit animals or that Plaintiffs themselves care for animals, they do so inferentially, and therefore suggestively. Indeed, it is difficult to perceive how one can extract any meaning from the marks without a leap of imagination or abstraction, given that no known animal leaves a paw print that is precisely in

---

for athletic teams "suggestive" or "arbitrary" because image at most suggested that athletes shared attributes of a bulldog but did not actually describe what a college athlete looked like).

[5] A trademark may achieve incontestable status if, after being registered, it remains in continuous use for a period of five years and the owner then files an affidavit "affirming that certain statutory requirements have been met." *Wilhem Pudenz, GmbH Littlefuse, Inc.*, 177 F.3d 1204, 1208 (11th Cir. 1999). Once a trademark is designated incontestable, challenges to its validity are limited to the specifically enumerated defenses provided in 15 U.S.C. § 1115(b). *Id.* That is in contrast to pre-incontestable status, where an alleged infringer can refute a trademark's validity by "proving any legal or equitable defense or defect . . . which might have been asserted if such mark had not been registered." 15 U.S.C. § 1115(a).

[6] Viewing the facts in their favor, I assume Plaintiffs refer to their revenue sharing arrangement with animal rescue organizations.

the shape of a heart. The cases CUSA cites are inapposite. *Wiley v. American Greetings* involved a common law mark, not one registered with the PTO. *Wiley v. Am. Greetings Corp.*, 762 F.2d 139, 140 (1st Cir. 1985) (denying trademark protection for heart symbol placed on teddy bear chest). The First Circuit relied on the *Seabrook* test, which, as discussed in n.4, the Eleventh Circuit has endorsed only in the trade dress context. *See supra*, n.4. Moreover, the heart paw mark is distinct from the teddy bear heart in *Wiley* because it is stylized so as to convey a characteristic about the goods more specific than love in the abstract. CUSA's district court cases fail for the same reason. Because the heart paw marks are suggestive, Plaintiffs need not establish secondary meaning to prove that the marks are distinctive. *Am. Television*, 810 F.2d at 1549.

Nonetheless, the other strength factors point against Plaintiffs. First, as CUSA observes, at least three other animal services businesses not only use a heart paw in their logos, but have in fact registered those marks with the PTO. In addition, CUSA provides evidence of various other companies that offer clothing and/or jewelry which incorporate a heart into a paw print image. That evidence demonstrates that it would be difficult for consumers to identify the heart paw exclusively with Plaintiffs' brand. *See Fla. Int'l Univ.*, 830 F.3d at 1257-58; *Frehling*, 192 F.3d at 1136. With respect to incontestability, although Plaintiffs assert in their Complaint that their marks have attained such status (Compl. at ¶ 11), they have not submitted any evidence of having filed the requisite affidavit. Accordingly, Plaintiffs' marks are contestable.

Given the clash between these indicators, I conclude that the marks have intermediate strength. They suggest, rather than describe, a value that 3 Dawg seeks to represent in its apparel. But many other entities have hit upon the same embodiment of that value. This factor does not weigh in favor of either Party.

2. <u>Similarity of the Marks</u>

The more similar the putative infringer's mark to the plaintiff's, "the greater the likelihood of confusion." *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, the Ecumenical Order*, 809 F.3d 1171, 1186 (11th Cir. 2015) (quoting *Exxon Corp. v. Tex. Motor Exch. Of Hous., Inc.*, 628 F.2d 500, 505 (5th Cir. 1980)). The court determines similarity by drawing a holistic impression of the marks, while also considering "the manner in which the marks are used." *Id.* (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983)).

CUSA argues as a threshold matter that Plaintiffs have failed to even identify which specific items it sells infringe on their marks. Nor do they explain which particular design features of any such items imitate Plaintiffs' marks. That is necessary, they insist, because many of their designs differ from Plaintiffs' in (a) the proportions of the heart's rounded parts; (b) the depth and angle of the rounded parts' "cleavage"; (c) the sharpness of the bottom of the heart; (d) the shape of the digital pads and their disposition relative to the metacarpal pad; and (e) the presence of surrounding typeface.

CUSA does not point to any case law suggesting that a trademark plaintiff must produce an exhaustive list of allegedly infringing goods and a detailed comparison of each good to the plaintiff's own. Because of the variety of paw print designs on products that CUSA sells, it is impossible to isolate with mathematical precision which goods are "colorable imitation[s]" of Plaintiffs' marks. 15 U.S.C. § 1114. Suffice it to say that there is a gradation of paw shapes, from those, on one end, with relatively un-indented metacarpal pads depicting something close to an anatomically correct paw print, to those pads at the other end, which feature heavy

indentations and sharp apexes, clearly imitating the platonic image of the heart symbol.[7] These latter designs evoke the same themes as Plaintiffs' marks – that is, love and compassion for animals in general, and dogs in particular.

More significant is the manner in which these designs are used. Trademark protection exists to "enable a business to identify itself efficiently as the source of a given product." *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931, 935 (7th Cir. 1989). Consequently, the Lanham Act does not protect an enterprise's use of a mark that does not have a source-identifying function. "If the use of a mark serves only a functional purpose, there is not a likelihood of confusion." *Greater Anchorage, Inc. v. Nowell*, 974 F.2d 1342 at *3 (9th Cir. 1992) (Table). This "functionality doctrine" provides that no trademark rights will inhere in a mark's features if it will put a competitor at a significant disadvantage because the feature is 'essential to the use or purpose of the article' or 'affects [its] cost or quality.'" *Qualitex Co. v. Jacobson Prod. Co., Inc.*, 514 U.S. 159, 169 (1995) (quoting *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 850, n.10 (1982)); *see also Dippin' Dots, Inc. v. Frosty Bites Distributions, LLC*, 369 F.3d 1197, 1203 (11th Cir. 2004) (articulating "competitive necessity" and "affecting cost or quality" inquiries as two separate tests). Thus, when the benefit of a design lies solely in its aesthetic appeal to consumers, it is functional and therefore a legitimate object of imitation. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1262 (9th Cir. 2001). Even if ones assume, as Plaintiffs would have it, that they use their marks for a source-identifying purpose,[8] that is entirely different from

---

[7] However, none of CUSA's uses are particularly similar to the 3 Dawg mark. Similarity between the features of two marks is likely to cause confusion only when the "dominant portions of the two marks are the same." *Country Floors, Inc. v. P'Ship Composed of Gepner & Ford*, 930 F.2d 1056, 1065 (3d Cir. 1991). In the 3 Dawg mark, the heart paw is not a dominant feature, as it is only an embellishment on the typeface for the "3 Dawg" name. None of CUSA's uses on the record contain references to "3 Dawg."

[8] This is a subject that the Parties vigorously debate on the validity prong.

the context in which CUSA uses their designs (whether upright or inverted). A review of the record reveals that all of CUSA's uses of heart paw designs are decorative. Indeed, CUSA often markets its clothing and jewelry to indicate the combination of heart and paw designs. That marketing practice demonstrates that such designs are oriented towards appealing to customers' aesthetic preferences, not towards identifying CUSA as the maker of the items.

Precluding CUSA from incorporating these designs into their products would put them at a competitive disadvantage in the market for animal lovers. *Dippin Dots*, 369 F.3d at 1203, n.7 ("color, shape, and size of dippin' dots are 'aesthetic functions' that easily satisfy the competitive necessity test because precluding competitors . . . from copying any of these aspects of dippin' dots would eliminate all competitors in the flash-frozen ice cream market"). Therefore, the functionality doctrine is an effective shield to protect CUSA's competitive use of the heart paw designs. *See Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 920 (9th Cir. 1980) (jeweler did not infringe on organization's collective mark by producing jewelry bearing mark to appeal to customer's desires to express allegiance to organization); *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 925 F. Supp. 2d 1067, 1073-75 (C.D. Cal. 2012) (defendant did not infringe on protected image of Betty Boop by using character as design on towels). Accordingly, while some of CUSA's products bear similar designs to the heart paw marks, they are not used in a manner that would be confused with any source-identifying function those marks may serve for Plaintiffs. I find that this factor weighs in CUSA's favor.

3.  Similarity of Goods

"This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling*, 192 F.3d at 1338. CUSA

argues that its product line is much broader than Plaintiffs'. Despite overlap in selling t-shirts and hats, CUSA, according to Kunin, also sells "jewelry, Christmas ornaments, cell phone cases, wallets, bags, luggage, mugs and other kitchen items, magnets, rain boots, sheets and blankets, and many other items." (DE 29 at 20).[9] Because the range of Plaintiffs' product line is limited to shirts, shorts, and hats, it is unlikely that any consumers would confuse CUSA's non-garment products with Plaintiffs'. But the fact that an allegedly infringing entity sells goods beyond those of the kind that a plaintiff seeks to protect does not mean that the public would not necessarily attribute the products that do overlap to the same source. Here, there is no question that Plaintiffs and CUSA both sell t-shirts, hats, and shorts. Therefore, they offer similar goods and this factor weighs in Plaintiffs' favor.

4. Similarity of Sales Methods

"This factor takes into consideration where, how, and to whom the parties' products are sold." *Frehling*, 192 F.3d at 1339. There is no dispute that both Parties sell their products online. However, Godinho testified that she did not believe Plaintiffs' website has received much traffic. More importantly, Plaintiffs admit that most of their sales derive from in-person cash sales at dog events. There is no evidence that CUSA participates in any such events. Most of its sales come from the RescueSite. Thus, the type of marketplace for each Parties' sales are quite different.

---

[9] Plaintiffs do not dispute the substance of this claim. They argue only that Kunin's statement in an affidavit is not a sufficient basis to establish CUSA's product line. However, I am convinced that as CEO, Kunin is competent to offer evidence about his company's product line. The Federal Rules provide that a party may offer a declaration to support or oppose summary judgment so long as it is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Datta v. Asset Recovery Solutions, LLC*, 191 F. Supp. 3d 1022, 1027 (court could rely on CEO's affidavit because knowledge about relationship between own company and vendors was within scope of CEO's competency).

That is true of the geographic market as well, which the Eleventh Circuit has described as a "relevant" consideration to determining the likelihood of confusion. *Tana*, 611 F.3d at 780. Although Plaintiffs insist that they have sold their apparel across the country and in Canada, a review of the record demonstrates that such evidence is paltry. As noted above, the vast majority of Plaintiffs' sales occur at dog events, which all take place in South Florida. Furthermore, the only evidence that Plaintiffs have produced for sales outside of Florida are three invoices for orders to Kentucky, Oregon, and Canada (totaling $97.95), plus four shipping labels for orders to Georgia, Maine, California, and New York (for which there is no evidence of price). Seven sales outside of Florida is not enough to put the geographic scope of Plaintiffs' business in material dispute. 3 Dawg's customer base is obviously local to South Florida. CUSA has not offered evidence of the geographic distribution of its sales. But by its very nature, a sales model that is dependent on website purchases will lead to geographically dispersed customers.

As to the type of customer that each Party attracts, it seems clear that both target pet owners and animal lovers, though as previously alluded to, the fact that the marks at issue may, in and of themselves, appeal to such customers creates serious doubt that they have a source-identifying purpose. I conclude that, in light of the different methods and geography of sales, this factor weighs in favor of CUSA.

5. <u>Similarity of Advertising Methods</u>

It is difficult to gauge this factor because there is insufficient evidence to compare the two sides' advertising efforts. Plaintiffs focus on their social media presence and maintenance of their website. CUSA points to Godinho's testimony that she has not spent more than $1,000 per year on advertising and Godinho's perception that her advertising investments were not bearing fruit. But neither Party explains how CUSA advertises its products or how much it invests in

doing so. Given this failure, I must conclude – in the absence of citation to record evidence – that this factor is neutral.

## 6. Intent to Infringe

The record does not support the contention that CUSA had any intent to capitalize on Plaintiffs' mark. In fact, it appears that CUSA did not become aware of the marks until 2015, when Godinho contacted Kunin. Plaintiffs argue that CUSA was on constructive notice of the marks by virtue of CUSA's internal procedures for identifying infringements and the existence of Plaintiffs' website. Yet Plaintiffs do not cite to any case law suggesting this factor can be satisfied by a showing of constructive knowledge. Nor could they. The law of this Circuit is clear that to warrant a finding on this factor in a plaintiff's favor, there must be direct or circumstantial evidence that the defendant consciously adopted a mark "with the *intent* of deriving benefit from the reputation of the plaintiff." *Hospitaller Order*, 809 F.3d at 1188 (emphasis added). In other words, it must be done in "[b]ad faith." *Id.* There is absolutely no evidence that Kunin or any employee of CUSA copied Plaintiffs' marks intentionally, or even with actual knowledge of the marks' existence. This factor weighs in favor of CUSA.

## 7. Actual Confusion

The "best" indicator of whether consumers are likely to be confused by similar marks is whether there is evidence that such confusion has already occurred. *Id.* at 1189. "The strength of such evidence depends on the number of instances of confusion, the kinds of persons confused, and the degree of confusion." *Id.* (citation and internal quotation marks omitted). In this case, there is almost no evidence of actual confusion. Plaintiffs identify only one named individual –"Alice," a friend of Godinho's – who informed Godinho that she had received emails from CUSA promoting items she assumed were Plaintiffs'. (DSOF at ¶ 38). There is some

evidence that Godinho provoked Alice's comment by mentioning this lawsuit. (Godinho Depo. 210:18-23). Godinho also referred vaguely in deposition testimony to two other individuals who may have received similar impressions of CUSA's product line. (DSOF at ¶ 38).

A "handful of anecdotal evidence is de minimis" for purposes of ascertaining actual confusion. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092 (10th Cir. 1999). Here, Plaintiffs' anecdotal evidence is even less than a handful. And while there is no requirement that actual confusion be evinced through surveys or other data-driven research, Plaintiffs' failure to produce any such systematic evidence is telling. Consequently, the actual confusion factor weighs strongly in favor of CUSA.

Conclusion

It is incumbent on the district court not merely to tabulate which factors favor which party, but to "evaluate the weight to be accorded the individual subsidiary facts" based on the circumstances of the case. *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 840, n. 17 (11th Cir. 1983). The Court also bears in mind, as noted above, that the strength of the mark and the existence of actual confusion are the two most probative factors. *Frehling*, 192 F.3d at 1135. With those principles in mind, I conclude that this is a mark of intermediate strength, being somewhat suggestive yet widely used among animal-related services. On the other hand, there is barely any evidence of actual confusion between Plaintiffs and CUSA's customers. It is also significant that 3 Dawg's sales are limited to a particular locale. Finally, I find it critical that CUSA uses heart paw designs in a purely ornamental fashion to appeal to potential customers' values and aesthetics. The likelihood that consumers nationwide will believe that CUSA's designs are meant to denote that Plaintiffs' company is the source of the apparel is extremely low. Under these circumstances, no reasonable jury could find a likelihood of confusion. Thus,

summary judgment in CUSA's favor is appropriate. As discussed above, this finding with respect to Plaintiffs' Lanham Act claims is "equally conclusive" of their common law and FDUTPA claims. *Babbit Elec.*, 38 F.3d at 1181.

### B. CUSA's Counterclaims

CUSA's Answer contains five counterclaims stating various grounds for cancelling the upright and inverted heart paw marks. While the question of a mark's validity remains justiciable for the Court's adjudication after a finding of non-infringement, *see Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 729 (2013) (in trademark case, affirming principle that "a court's decision to rely on one of two possible alternative grounds (noninfringement rather than invalidity) did not strip it of *power* to decide the second question") (quoting *Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 98 (1993)), the decision to hear the cancellation counterclaim remains a matter of discretion. *Neely v. Boland Mfg. Co.*, 274 F.2d 195, 202 (8th Cir. 1960). I decline to rule on the validity question and the dependent counterclaims requesting that Plaintiffs' marks be cancelled. Furthermore, I do not believe it appropriate to retain jurisdiction over CUSA's contract-based claims, which initially came within the Court's supplemental jurisdiction. 28 U.S.C. § 1367. Federal law permits a district court to relinquish that kind of jurisdiction when it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). As that is the case here, I decline to exercise supplemental jurisdiction over CUSA's breach of contract and promissory estoppel claims.

Accordingly, it is hereby **ORDERED** and **ADJUDGED** that

(1) Defendant CharityUSA.com, LLC's ("CUSA") Motion for Summary Judgment (DE 29) is **GRANTED IN PART**. Final judgment in CUSA's favor will be entered by separate order; and

(2) CUSA's counterclaims are **DISMISSED WITHOUT PREJUDICE**.

**DONE AND ORDERED** in Chambers, at West Palm Beach, Florida, this *17* day of

May, 2017.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

cc: All Counsel of Record